UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 17-CR-06-S-PAS |
| | ) | |
| RAYMOND E. GALLISON, JR., | ) | |
| Defendant | ) | |
| | ) | |

## DEFENDANT'S SENTENCING MEMORANDUM

### I.   INTRODUCTION

The defendant, Raymond E. Gallison, Jr., is before the court for sentencing, having pled guilty to charges of mail fraud, wire fraud, aggravated identity theft, and tax offenses.[1]  The facts of the case before the Court embrace three areas of conduct.  The first relates to Mr. Gallison's management of the Estate of a decedent identified in the Information as Person A, during which he embezzled or converted to his control Estate property of a total value of approximately $678,000.  The matters relating to the Estate give rise to the mail fraud (Counts One through Four) and aggravated identity theft (Count Six) charges of the Information.  The second concerns Mr. Gallison's misappropriation of the sum of $8,900 from the Special Needs Trust of an individual identified as Person C in the Information, which is the basis of the wire fraud charged in Count Five.  And the third consists of tax offenses charged in Counts Seven through Nine of the Information.  Of these, one (Count Seven) relates to the filing of a false tax return for a non-profit entity by which he was employed, and the other two concern the filing of false personal tax

---

[1]Pursuant to his plea agreement (PA), Mr. Gallison waived presentment to a grand jury, and agreed to plead guilty to all counts of the Information [PA at ¶1(a)].  As a result of the plea to Count Five, he is subject to a mandatory sentence of imprisonment of two years, which must be imposed consecutively to any other sentence her receives. Title 18 U.S.C. §1028A.

1

returns for the years 2012 (Count Eight) and 2013 (Count Nine), in which he failed to include as income the amounts taken from the Estate, as well as certain other income derived from his employment.

## II.     SENTENCING CONSIDERATIONS

The provisions of 18 U.S.C. §3553(a), and their extensive interpretive case law are well-established.  The court must first undertake a calculation of the advisory sentencing guideline range, and then consider the other statutory sentencing factors.  United States v. Jiménez-Beltre, 440 F.3d 514, 518 (1st Cir. 2006) (en banc), cert.denied, 549 U.S. 1118 (2007).[2]  The totality of these circumstances, once identified, is to be used to determine a sentence "sufficient but not greater than necessary" to achieve the goals of sentencing.[3]  The defense submits that  a non-Guidelines sentence[4] meets the requirements of the statute in this case.[5]

### A.     Establishing The Guideline Range

When approaching the first phase of the process—establishing the Guideline Sentencing Range (GSR)—it is important to note that "[t]he guidelines consider only the bad things a person

---

[2]The First Circuit has often noted that this step must be taken first.  See, e.g., United States v. Dávila-González, 595 F.3d 42, 46-47 (2010), quoting United States v. Pelletier, 469 F.3d 194, 203 (1st Cir. 2006)(citing Jiménez-Beltre).

[3]Pursuant to 18 U.S.C. §3553(a), the court is required to impose a sentence that is "sufficient but not greater than necessary [emphasis supplied]" to comply with the purposes set forth in 18 U.S.C. §3553(a)(2), which reflect "the need for the sentence to be imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. §3553(a)(2).

[4]See, Gall v. United States, 552 U.S. 38, 59 (2007); Pepper v. United States, 526 U.S. 476, 489-90 (2011).  See also, United States v. Soto-Rivera, 811 F.3d 53, 59 n. 9 (1st Cir. 2016).

[5]The plea agreement provides that the government will recommend that the court impose a guideline sentence as to Counts One through Five and Seven through Nine, and the consecutive mandatory sentence of two years' imprisonment as to Count Six  [PA at ¶2(a) and (b)].  According to the Presentence Report (PSR), the Guideline Sentencing Range (GSR) is 33-41 months (PSR at ¶100).

has done in his life, not the good." <u>United States v. Morgan</u>, 2012 WL 1161417, *4 (E.D.Wis. April 6, 2012)(Adelman, J.).[6]

    The Presentence Report (PSR) has set the Combined Offense Level for Counts One through Five and Seven through Nine at 23.[7]  This figure includes an upward adjustment of fourteen levels required for the Specific Offense Characteristic reflective of the stipulated guideline loss amount[8], as well as a Chapter 3 adjustment of two additional levels for the defendant's abuse of trust in connection with the misappropriation of the funds from Person C's special needs trust.[9]  After a two-level reduction for acceptance of responsibility[10], and assuming (as did Probation) an additional one level reduction at the request of the government[11], the Total Offense Level is 20, which produces a GSR of 33-41 months.[12]

    Mr. Gallison has not objected to the Guideline calculation.[13]  He does, however, suggest that despite his agreement with the technical accuracy of the loss amounts and their inclusion in the Guideline calculus, in the factual context of this particular case, they tend to overstate the penalty—a factor which should be taken into consideration with respect to the weight to be given

---

[6]As will be seen below, this is particularly relevant in Mr. Gallison's case.  <u>See</u>, Section II.B.1.b., and footnote 28, below at pp. 9-10.

[7]PSR at ¶35.

[8]PSR at ¶32; PA at ¶4(b).

[9]PSR at ¶35.  This guideline enhancement is not contested.

[10]U.S.S.G. §3E1.1(a); PSR at ¶47; PA at ¶2(c).

[11]U.S.S.G. §3E1.1(b); PSR at ¶48; PA at ¶2(d).

[12]PSR at ¶100.

[13]He does, however, have other objections to the PSR, as described below.  <u>See</u> footnote 27, below, at p. 9.

to the guidelines[14], as well as in the determination of an appropriate sentence within the meaning

of 18 U.S.C. §3553(a).[15]  While the defendant has stipulated to the Guideline loss amount in his

plea agreement[16], and that it is clear from the Guideline Application Notes that he is not entitled

to a credit against the loss amount[17] for the significant amounts of restitution he has made, the

court should nevertheless consider the severe mitigation of actual loss in this case in two ways.

### 1.   Overstatement of the Severity of the Offense.

Although the defendant has stipulated to the loss amount for Guideline purposes, it

should not be overlooked that the court may simply adjust the range because it overstates the

defendant's culpability and bears no reasonable relationship to crafting an appropriate sentence.[18]

As Judge Gertner said in United States v. Mueffelman, 400 F.Supp.2d 368, 371 (D.Mass. 2005),

"[i]n sentencing Mueffelman, I discounted the Guideline sentencing range three levels because I

---

[14]While it is clear that 18 U.S.C. §3553(a)(4)(A) requires the court's consideration of the Guidelines, there is no statutory formula for determining their relative weight.  Courts have increasingly shown their concern that the Guidelines regularly overstate the penalty in many cases, particularly for white collar crimes, because of their unbending adherence to mathematics rather than attention to the human characteristics of sentencing.  See, e.g., United States v. Adelson, 441 F.Supp.2d 506, 515 (S.D.N.Y. 2006); United States v. Parris, 573 F.Supp.2d 744, 745, 751 (E.D.N.Y. 2008), and citing Kimbrough v. United States, 128 S.Ct. 558, 575 (2007), [quoting Rita v. United States, 127 S.Ct. 2456, 2465 (2007)]; see also, United States v. Watt, 707 F.Supp.2d 149 (D.Mass. 2010).

[15]To the extent that the defendant seeks a below-Guideline sentence, the degree to which, in context, the calculation overstates the loss, also affects the extent to which the court is being asked to vary from the range.  See, United States v. Santa-Otero, 843 F.3d 547, 552 (1st Cir. 2016), quoting United States v. Dean, 414 F.3d 725, 729 (7th Cir. 2005)(Posner, J.).

[16]PA at ¶4(b).

[17]See, U.S.S.G. §2B1.1, Application Note 3(E) which states in pertinent part:

Credits Against Loss.—Loss shall be reduced by the following:

(i) The money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected. The time of detection of the offense is the earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency.

[18]Many courts believe that the loss guideline is "fundamentally flawed."  See, e.g., United States v. Corsey, 723 F.3d 366, 377-382 (2d Cir. 2013)(Underhill, J., concurring).

4

found that the amount of loss did not serve as a fair proxy for Mueffelman's culpability.  The sentencing range that resulted from that adjustment was more in keeping with Mueffelman's culpability and the purposes of sentencing."[19]

Finally, Guideline departures based on extraordinary restitution (discussed below), have also been used to offset loss determinations which resulted in offense levels that substantially overstated offense severity.  See, e.g., United States v. Roen, 279 F.Supp.2d 986, 991 (E.D.Wis. 2003); see also, United States v. Redemann, 295 F.Supp.2d 887, 896-898 (E.D.Wis. 2003).

## 2.      Extraordinary Restitution.[20]

The Guidelines initially recognized the concept of extraordinary restitution as a factor that could be considered in determining the appropriate Guideline range in two contexts:  one as an element of acceptance of responsibility; the other as a basis for a downward departure.[21]  These contextual applications were sometimes combined.  See, e.g., United States v. Weinberger, 91 F.3d 642 (4th Cir. 1996); United States v. Crook, 9 F.3d 1422, 1426 (9th Cir. 1993), cert. denied, 511 U.S. 1086 (1994).

---

[19]The overstatement of severity may also be demonstrated by a sentencing disparity that does not depend on the loss amount.  For example, in United States v. Winingear, 422 F.3d 1241 (11th Cir. 2005), the defendant was indicted on 19 counts of mail fraud.  After being arrested in an attempt to flee, which included multiple assaults, a threat to kill a police officer, and a failed attempt to steal a truck, he eventually pled guilty to one count of the indictment.  The mail fraud scheme consisted of defrauding people by internet advertising of computer sales, accepting the payments in the amount of $19,600, but never sending the computers or refunding the money.  At sentencing, Winingear's PSR gave him no credit for acceptance of responsibility, recommended a two level enhancement for obstruction of justice, and found him to be a Category III offender, having accumulated four criminal history points.  The defendant received a within Guideline sentence of only 24 months.

[20]Although it is considered an important sentencing factor under 18 U.S.C. §3553(a), the matter of restitution is treated here instead of in Section II.B.5.a. of this Memorandum in order to avoid repetition.  The failure to treat it there does not in any way lessen its significance as an independently important sentencing factor, in this case, well-beyond the scope of its connection to establishing the Guideline range.

[21]"[T]he Guidelines provide the district judge with authority to depart downward based on extraordinary restitution."  United States v. Garlich, 951 F.2d 161, 163 (8th Cir. 1991).

At the outset, it should be noted that much of the case law concerning

extraordinary restitution was developed prior to Guideline amendments that currently

prohibit departures based on certain aspects of restitution.  <u>See</u>, U.S.S.G. §5K2.0(d)(5).

At the time many of these cases were decided, consideration of restitution was designated

as a "discouraged" factor in the departure context, rather than as a "prohibited" factor.  It

should also be noted, however, that extraordinary efforts toward restitution have still been

considered by the court in cases decided after the amendments became effective.  <u>See</u>,

<u>e.g.</u>, <u>United States v. Suarez-Reyes</u>, 2012 WL 6597814, *6 (D.Neb. December 18, 2010):

> Also, the court can depart on the basis of extraordinary restitution. *United States v. Oligmueller,* 198 F.3d 669, 672 (8th Cir. 1999) (stating "[w]e have previously held that cases can fall outside the heartland when there are extraordinary efforts at restitution").

<u>See also</u>, <u>United States v. Muzio</u>, 757 F.3d 1243, 1251 (11th Cir.), <u>cert. denied</u>, 135 S.Ct. 395

(2014), <u>reh. denied</u>, 135 S.Ct. 1035 (2015).  There, in considering the jurisdictional problems

posed by an appeal in a matter of a delayed restitution order, the court noted:

> Ensuring that jurisdiction over all aspects of a sentence is lodged in only one court at a time could avoid a potentially problematic situation. On occasion, a subsequent restitution order could affect the propriety of a defendant's initial judgment and sentence. *See, e.g.,* 18 U.S.C. § 3572(b) (permitting the imposition of a fine only to the extent that the defendant will still be able to pay restitution); 18 U.S.C. § 3582(a) (directing courts to consider the § 3553(a) factors, including the need for restitution, in deciding whether to impose a term of imprisonment); *United States v. Kim,* 364 F.3d 1235, 1238 (11th Cir. 2004) (explaining that "extraordinary restitution, whether paid before or after adjudication of guilt, may, in the unusual case, support a departure from the guidelines"). If the district court retains power over the initial sentence, it could revise the initial sentence to account for the restitution award. If, however, we take jurisdiction over an initial judgment before restitution is entered, the district court may lose this power to appropriately revise its initial judgment to reflect the eventual restitution award.

As is the case here, replacing the entire loss amount in the absence of a restitution order from the court and prior to sentencing is extraordinary.[22]  In this case, the defendant cooperated with the government's criminal investigation immediately upon being advised of his target status.[23]  Grand jury subpoenas were issued and accepted by agreement for the production of records, and he began plea discussions so early on the process that the government not only had to expend no time preparing for trial, it was required to spend no time in the indictment process.

The nature of the investigation required the passage of some time before the parties could agree on a charging document; but during that period—in fact, by as early as May of 2016—the defendant (through his counsel), had turned over to the F.B.I. all the stock certificates in his possession, and thereafter cooperated fully with the government, the court, and Estate counsel to accomplish the transfer of those assets to control of the Estate.  Soon after a new Executor was appointed by the Probate Court in June, 2016 the defendant, in July, arranged for the return to her of all other Estate property remaining in his custody.  Throughout the balance of the year, he continued to cooperate with the government to reach an agreed upon Information and a Plea Agreement, both of which were filed in January of this year.[24]  At the same time, defense counsel worked diligently with government investigators in determining the monetary losses to arrive at an accurate restitution figure.  As part of his plea agreement—that is, prior to the entry of his guilty plea—the defendant had already agreed to make a partial restitution payment of $100,000

---

[22]See, e.g., United States v. Forchette, 220 F.Supp.2d 914, 925 (E.D.Wis. 2002); compare, e.g., United States v. Hairston, 96 F.3d 102, 105 (4th Cir. 1996), cert. denied, 519 U.S. 1114 (1997).

[23]This occurred at approximately the end of February in 2016.  By the end of March, the defendant had retained counsel and negotiations to resolve the matter were well underway.

[24]Defense counsel has also prepared for approval by counsel for the Estate a release and stipulation of dismissal of the Probate litigation concerning these same activities.  The release has been approved by Estate counsel, and the stipulation has been submitted to the Probate Court for approval, which awaits only the delivery of the restitution payment by the Clerk of the District Court to Estate counsel.

before sentencing, and to pay the balance as soon thereafter as possible.[25]  Meanwhile, the

defendant was already in the process of raising the funds, in part by liquidating family retirement

accounts, and paid not only the $100,000 in partial restitution, but the entire amount as calculated

by the government—more than $162,000.

### B.    The Other Statutory Factors

Having first performed the calculation required by 18 U.S.C. §3553(a)(4)(A) to establish

the GSR, we turn to the statute's other considerations.

#### 1.    Nature and circumstances of the offense and history and characteristics of the defendant[26]

##### a.    The Offenses

A statement of facts made at the change of plea hearing established the factual predicate

required for the defendant's guilty plea.  In addition, the government provided the probation

officer a similar description of the offense conduct which is included in the presentence report

(PSR at ¶¶8-23).  Those facts are expanded or referenced as necessary below.

The offense conduct, even as described in the PSR, describes three areas of fraudulent

activity.  The first is that associated with the management of the probate estate (PSR at ¶¶10-14,

as charged in Counts One through Four of the Information), and the related aggravated identity

theft (described at PSR ¶14, and as charged in Count Six).  The second consists of Mr. Gallison's

misappropriation of funds from Person C's special needs trust, and its misapplication to a debt of

the organization which employed him (AEP).  (PSR at ¶15).  And lastly is the conduct giving

---

[25]The government initially demanded full restitution prior to sentencing; however, that demand was made at a time when the total restitution amount was not yet determined, and the defense could not agree to such a payment without knowing whether the defendant could accomplish it.  The parties therefore agreed to a partial payment of $100,000 with the balance to be paid as soon thereafter as possible.

[26]18 U.S.C. §3553(a)(1).

rise to the tax offenses.  As to Count Seven, Mr. Gallison, in filing the 2012 Tax return for AEP, falsely reported expenses payments, misidentified corporate officers and directors, improperly accounted for the funds taken from the special needs trust to pay a corporate obligation, and forged the signature of a purported officer on a filing authorization (PSR at ¶¶16-20); and as to Counts Eight and Nine, he failed to include certain income, including the amounts wrongfully obtained from the Estate, on two income tax returns (PSR at ¶¶21-22).[27]

### b.    Background

Mr. Gallison's background is generally set forth in Part C of the PSR (at ¶¶56-97).  However, some additional facts are worth noting.

First, and probably most important, is the emphasis Mr. Gallison places on helping others, much of which he did during his tenure as a State Representative.  The defense does not suggest that Mr. Gallison was unaware of the illegality of his conduct, or that he does not take full and complete responsibility for his actions.  But to assume that there is nothing more to the person than being only someone who has admitted he committed a crime would be to ignore the "history and characteristics" of the defendant.  Mr. Gallison is not an evil person.  As the letters of support from many individuals attest, he has done much to help others in a way that evil people simply cannot—and do not—do.[28]  The nature of their various interactions with Mr. Gallison entitle their opinions to serious consideration.  The areas in which he appears to have had the most significant impact on others are with respect to the defeat of efforts to establish an

---

[27]The PSR also describes other "relevant offense conduct.  PSR at ¶23.  The defendant objected to the inclusion of that conduct in the PSR when it was first disclosed (Document 13-2, attached to the PSR).  The government responded to the defendant's objections (Document 13-3, attached to the PSR), and both the objections and response are included in the final version of the PSR.  The defendant maintains his objection and this issue will require resolution by the Court.

[28]The defense has submitted to the Court numerous letters of support from people whom Mr. Gallison has helped during a long career in public service.

LNG terminal in Narragansett Bay, and in matters concerning Veterans' Affairs, particularly the construction of the new Veterans' Home.[29]

The letters from Mr. Gallison's supporters, not surprisingly, ask for leniency. They do not, however, discount his conduct, or ignore his offenses. Instead they ask the court to consider the human being. Nearly all of them commend his decision to immediately accept responsibility for his actions and resolve this case. Hopefully, as sentencing is ultimately an individualized exercise in the evaluation of human frailty, these letters will assist the court in its statutory obligation to consider the essence of what they represent—the "history and characteristics of the defendant".

Second, it is critical, in evaluating Mr. Gallison in the context of this case, to appreciate not only what the case is about, but what it is not about. The government made it a point to include in the Information a reference to Mr. Gallison's former status as a State Representative. His position, in fact even his membership in the General Assembly, had nothing to do with the facts of this case or the offenses of conviction. Without in any way depreciating the seriousness of those offenses, this is a case in which the criminal actions were undertaken by the defendant in a fiduciary—not an official—capacity. This component has been acknowledged by Probation in the two-level Guideline enhancement for abuse of a position of trust. (PSR at ¶35). The defendant is not charged with honest services fraud or with using his position as a member of the General Assembly to further his personal ends. His former public position is not an element of these offenses. In short, this is not a public corruption case, despite any effort, whether by the government or the public, to make it appear so. United States v. Barone, 913 F.2d 46, 50-51 (2d

---

[29]The letters speak very well for themselves and will not be restated here.

Cir. 1990) (defendant's position as a local judge and lawyer did not warrant an upward departure

in sentence for perjury and tax evasion).  The Court in <u>Barone</u> held that:

> The district court premised the upward departure upon its finding that the
> Sentencing Commission did not adequately consider the "totality" of the
> circumstances present, citing the duty Barone owed to his community as a local
> judge and lawyer, the fact that in spite of his status as a community leader he gave
> perjured testimony, and the delay such testimony caused the State's efforts to
> investigate and clean up the dumpsite. These circumstances are not grounds for an
> upward departure.
> The Sentencing Commission considered and rejected the sentencing
> court's reliance upon a defendant's socio-economic status as a factor at
> sentencing. *See* U.S.S.G. § 5H1.10. While the Commission did provide that a
> defendant's education may in some instances be relevant, it limited consideration
> of this factor only to those cases where a defendant has "misused special training
> in perpetrating his crime." *United States v. Burch,* 873 F.2d 765, 769 (5th Cir.
> 1989); U.S.S.G. § 5H1.2. Here, the record does not show that Barone used his
> public office or his legal training to facilitate the crimes of perjury or tax evasion.
> No findings support the conclusion that he might have used his public office to
> facilitate the operation of the landfill or that his involvement in the operation of
> the dumpsite was criminal. Hence, Barone's position in the community, his
> profession, and the fact that he had held public office are not factors in this case
> warranting upward departure. *See* U.S.S.G. § 5H1.6.

There is no doubt that the Court is aware of its responsibility to deal with the defendant

fairly.  The public, however, expects that to include an enhanced penalty based on the

defendant's former political position.[30]  For example, nearly two weeks before the defendant's

sentencing memorandum was even submitted, a letter from a member of the public was filed on

the case docket asking the court to "send a message" to politicians that "they are not above the

law."  The writer makes it clear in the letter that he is aware that the crimes of conviction are

fraud offenses having no connection to the State House.  Nevertheless, he seeks to place this

---

[30]Document 10.

defendant alongside the likes of Gordon Fox[31], John Celona[32], Gerard Martineau[33], and any number of others convicted in this court in what were <u>actual</u> public corruption cases.

A non-public corruption case involving a public official should be treated the same as other cases involving similar offenses committed by non-public figures.  <u>Barone</u>, <u>supra</u>.  The additional penalty for the added feature of the defendant's <u>public</u> status is already imposed, not by the court, but by the <u>public</u> itself:  the fall from grace; the humiliation, embarrassment, and loss of dignity that accompany the defendant's very presence before the court; the collateral consequences of the same humiliation and embarrassment to his family, the loss of his employment and his license to practice law; the loss of self-esteem in a very public forum; the loss of his and his family's privacy.  These are all very real ramifications of this case, and they are themselves the punishment for the perceived "element" of his former public status.  In many ways, the public exacts a greater toll on the defendant than the court.  In fact, circumstances like these can sometimes result in a downward departure because some of the objectives of sentencing have already been achieved in other ways.  <u>See</u>, <u>e.g.</u>, <u>United States v. Redemann</u>, <u>supra</u>, 295 F.Supp.2d at 896-98.

Similarly, this case is not about a lawyer abusing his licensed position as a member of the bar.  The allegations against the defendant as well as the crimes of conviction are concerned with his activities in a <u>different</u> fiduciary capacity—not that of a lawyer representing a client, and do not involve malfeasance as an attorney.  <u>United States v. Barone</u>, <u>supra</u>.

---

[31]Mr. Fox received a sentence of thirty-six months' imprisonment for convictions for bribery, wire fraud and filing a false tax return, in what <u>really was</u> a public corruption case.

[32]Mr. Celona received a sentence of thirty months' imprisonment for honest services fraud, another <u>actual</u> public corruption case.

[33]Mr. Martineau received a sentence of thirty-seven months' imprisonment, also for honest services fraud.

No doubt, the offenses are serious. No doubt, the Guideline loss amount was significant. No doubt the case has garnered more than its fair share of notoriety, all of which is attributable to the defendant's former political position. This, however, does not define the case or the defendant.

Third, there is certain personal information contained in the PSR (see PSR ¶58; see also PSR at ¶¶65, 72), and medical circumstances (PSR at ¶¶75-83), which the Court should consider as well in making an overall evaluation of Mr. Gallison. See, United States v. Carlos, 2012 WL 1378516, *8 (D.N.M. April 9, 2012) (significant health problems support a lack of likelihood of recidivism). See, also, e.g., United States v. Carmona-Rodriguez, 2005 WL 840464, *5 (S.D.N.Y. April 11, 2005) (narcotics conviction, defendant had variety of health problems, sentenced to 30 months, 16-27 months below guideline range); United States v. Nellum, 2005 WL 300073 (N.D.Ind. February 3, 2005); United States v. Ricciardi, 1998 WL 635882 (S.D.N.Y. September 15, 1998) (embezzlement case, myriad health problems, sentence of probation, home detention and electronic monitoring). In particular, the Court's attention is directed to the medical conditions associated with his several back surgeries (which were necessitated by injuries sustained in two automobile accidents)(PSR at ¶¶75, 82); rotator cuff surgery (PSR at ¶80), and his associated treatment by Dr. Cervone (PSR at ¶77); and surgery for a deviated septum; as well as the plethora of medications he is required to take (PSR at ¶79).[34]

---

[34]The Probation Officer has requested and received medical records from most if not all the providers identified at PSR ¶75, and the court is welcome to consult them directly. These issues will not be further explicated here due to medical, personal and family privacy considerations. The court is urged to review these PSR notations carefully and give them serious consideration in its determination of the length of an appropriate sentence.

### 2.   Punishment, [Individual] Deterrence and Rehabilitation[35]

#### a.   Protecting the public from the defendant[36] and rehabilitation[37]

While Mr. Gallison has no previous criminal history and, in particular due to his age, it is unlikely he will commit another offense[38], the court must consider future protection of the public.  In so doing, it is important to consider that although Mr. Gallison did not use either his position as a lawyer or as a public official to commit any offense, a necessary consequence of his conviction will be that he will almost certainly never again be able to engage in either of those endeavors.[39]  While that has no direct impact on individual deterrence in this case, it will have the effect of limiting his interaction with the public in circumstances which might otherwise create an opportunity for misconduct to occur.

As to rehabilitation, it is a foregone conclusion that Mr. Gallison will be incarcerated and will therefore receive whatever rehabilitative and other services the Bureau of Prisons may offer. While they are not available only in the federal prison system, at a minimum, the mandatory sentence associated with the identity theft offense will place him in BOP custody for a period of

---

[35] 18 U.S.C. §3553(a)(2).

[36] 18 U.S.C. §3553(a)(2)(C).

[37] 18 U.S.C. §3553(a)(2)(D).

[38] See, e.g., United States v. Sanchez, 2007 WL 60517, *4 (S.D.N.Y. January 8, 2007); United States v. Green, 2007 WL 869725, *2 (S.D.Ohio, E.D. March 20, 2007); United States v. Carmona-Rodriguez, 2005 WL 840464, *5 (S.D.N.Y. April 11, 2005); United States v. Nellum, 2005 WL 300073 (N.D.Ind. February 3, 2005).

[39] Specifically with respect to his ability to practice law, Mr. Gallison (who was a member of only the Massachusetts bar) has cooperated fully with the Board of Bar Overseers (the Board) in the termination of his licensure to practice. Mr. Gallison first notified the Board of his voluntary discontinuance of the practice of law more than a year ago, on May 25, 2016, effective immediately, pursuant to Massachusetts Supreme Judicial Court Rule 4:02(5).  At that time, he turned over any pending legal matters to successor counsel.  Earlier this year, on May 23, 2017, at the request of Bar Counsel, Mr. Gallison submitted a Waiver of Hearing and Assent to Entry of an Order of Immediate Temporary Suspension, which Order was entered by the Court on May 24, 2017.  On May 26, 2017, again at the request of Bar Counsel, Mr. Gallison submitted an Affidavit of Resignation, which was filed with the Court on May 31, 2017 and the matter was placed on the Board's calendar for June 12, at which time an Order of Disbarment will enter.  His Affidavit of Compliance and related certifications will be filed with the Board and the Court as soon as possible thereafter.

time, and provide the availability of those services in any event.  In addition, he will be subject to

the Conditions of Post-Conviction Supervision recommended in the PSR[40], and which would be

a mandatory consequence of whatever sentence he receives.

### b.   [General] Deterrence[41], reflecting seriousness of the offense, promoting respect for the law, and imposing just punishment[42]

As to deterrence, while the sentence in this case may provide some measure of deterrence

to others similarly situated, the court should recognize that the statute refers to "adequate"

deterrence.  "Adequate" is not only a relative, but also a subjective assessment.  No individual

sentence in any case will provide "adequate [general] deterrence", assuming "adequate

deterrence" means to permanently deter everyone from committing economic crimes.  As the

court is well aware, "adequate" must also be applied in context, which is determined largely by

the target audience.  See, United States v. Gibbons, 2013 WL 3786868, *2 (D.R.I. July 17, 2013)

(Smith, J.) (quoting from his earlier sentencing decision).

Similarly, "seriousness" is also a relative term.  It is beyond dispute that the offenses are

serious.  It is equally undeniable that they are not violent crimes, do not involve drugs, guns or

violence, and did not at any time pose a danger to the health or safety of any human being.  The

absence of these elements should also be considered.[43]

Promoting respect for the law and imposing just punishment are more nuanced

objectives.  Unlike the absence of violence, for example, which is easily discernible from the

facts of the case, these factors are more subjective.  While promoting respect for the law among

---

[40]Attached to the PSR as Document 13-4

[41]18 U.S.C. §3553(a)(2)(B).

[42]18 U.S.C. §3553(a)(2)(A).

[43]See, e.g., Pub.L. 98-473, Title II, §239, Oct. 12, 1984, 98 Stat. 2039.

15

those other than the defendant (i.e., the public in general) can be attempted only by examples set

with individual cases, the question of whether "respect for the law" is ever "promoted" is

ultimately answerable only subjectively, as it depends on how the examples (either individually

or collectively) are internalized by each individual member of the target audience.[44]   The court

must surmise that whatever sentence it imposes will reach and be absorbed by whichever

members of the audience may be inclined to disrespect the law.   Moreover, whether this

endeavor can ever be successful is impossible to determine because the evidence of its success

lies in proving a negative—that something that likely would have happened, did not; and that its

failure to occur was the proximate result of this sentence that this judge gave to this defendant.

This is clearly an unenviable task.

      "Imposing just punishment" is even more difficult.   "Just" is not only a relative term, it is

also even more subjective than "respect", which has somewhat more of a universal character.

"Respect", which is more identifiable, is certainly more consistent than "justice", which is far

more amorphous and dependent upon context and circumstances.   Determining that a

punishment is "just" in one case by reference to what a different (or even the same) court has

done with a different defendant in a case with different (or even similar) context is not as simple

as the public would have it be.   The struggle to determine what is "just punishment" in any given

case is already immense.    It is enhanced when, as in this case, it is burdened further by the

application of a mandatory sentencing statute.   As Judge Coffin said in relation to the career

---

[44]Each case is different.  If the perception of the target audience is the purpose of this sentencing element, considering the defendant's public position when not a part of the case can work the other way.  As the Supreme Court said in Gall v. United States, 552 U.S. 38, 54 (2007), "Moreover, the unique facts of Gall's situation provide support for the District Judge's conclusion that, in Gall's case, 'a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing.' [quoting from the District Court sentencing proceeding]."

offender statute, "[i]t seems to me that removing all discretion from district judges in such cases substantially alters our notion of just punishment, both in absolute terms and relative to that of other offenders." United States v. Leavitt, 925 F.2d 516, 518 (1ˢᵗ Cir. 1991) (Coffin, J., concurring).

### 3. Available Sentences[45]

Although the court is constrained in this case by the application of the of the mandatory consecutive sentence on the aggravated identity theft count, it may nevertheless consider a variety of available sentencing components—a period of incarceration for one or more of the underlying offenses to which the Count Six sentence will be consecutive, and the successive mandatory supervised release that may itself include various conditions or components, such as halfway house placement, home confinement, and community service—to fashion an appropriate sentence here. While the court can use them in whatever combination it deems appropriate (subject to the limitations of the §1028A penalty), the result must be a sentence that is "sufficient but not greater than necessary" to achieve the goals of sentencing in this case.

### 4. Sentencing Disparity[46]

One of the statutory factors the court is required to consider under §3553(a)(6) is the avoidance of unwarranted sentencing disparity.[47] As noted earlier, sentencing is an individualized exercise, and while the sentences referenced below were imposed in consideration

---

[45]18 U.S.C. §3553(a)(3). See also, PSR, Part D, at ¶¶98-112.

[46]18 U.S.C. §3553(a)(6). See also, United States v. Panice, 598 F.3d 426, 441-43 (7ᵗʰ Cir. 2010).

[47]This is especially ironic because one of the principal reasons for the original enactment of the guidelines was to minimize sentencing disparity. See, Barrineau v. United States, 2011 WL 112502, *5 (D.S.C. January 13, 2011)(Norton, J.), app. dismissed sub nom. United States v. Barrineau, 451 Fed.Appx. 275 (4ᵗʰ Cir. 2011); see also, United States v. Booker, 543 U.S. 220, 295 n. 14 (2005). Avoiding national sentencing disparity is also an objective of 18 U.S.C. §3553(a)(6). United States v. Reyes-Rivera, 812 F.3d 79, 1449 (1ˢᵗ Cir.), cert. denied, 137 S.Ct. 487 (2016), quoting United States v. Marceau, 554 F.3d 24, 33 (1ˢᵗ Cir.), cert. denied, 556 U.S. 1275.

of some factors known only to the court, the comparisons are important in many other contexts, such as fundamental fairness, public perception, and general deterrence.  This is presumably the reason that avoidance of unwarranted disparity is a sentencing factor whose consideration is required by statute.

There have been several widely publicized, large-scale fraud prosecutions of recent vintage in our court, all with much greater actual losses and guideline loss figures, and all resulting in sentences below the applicable GSR.[48]  One, a multi-defendant government benefit theft case, involved an extensive and broad-based multi-million-dollar SNAP fraud.  All the defendants pled guilty to various charges including conspiracy, wire fraud, government benefit theft, and money laundering.  The highest sentence in that case was 36 months' incarceration and a $2 million restitution order.[49]  In another, the defendant pled guilty to multiple counts of filing false tax returns, wire and tax fraud, theft of government funds, forgery, and aggravated identity theft, in a large-scale scheme to prepare and file false tax returns for others.  The court imposed a sentence of 36 months' incarceration, which <u>included</u> the mandatory 24 months for the aggravated identity theft counts over which the court had no discretion, along with a restitution order for $1 million to the Internal Revenue Service.[50]  Other fraud cases in which the defendants pled guilty included one in which the court imposed a sentence of 24 months for wire fraud and obstruction of the IRS in a payroll service scheme[51], and another in which the defendant received a sentence of 39 months (also <u>including</u> the mandatory 24 months for aggravated identity theft),

---

[48]The defendant has already noted the disparities that would result if this case were treated, as the government intimates, as a public corruption case.  <u>See</u> footnotes 31, 32, and 33, above.

[49]<u>United States v. Al Kabouni</u>, 1:13-cr-119-L.

[50]<u>United States v. Guzman</u>, 1:16-cr-034-S.

[51]<u>United States v. Hebert</u>, 1:14-cr-085-S.

in a mail fraud case involving stolen securities, money laundering, and filing false tax returns.[52]

More recently, in a case where the defendant (unlike Mr. Gallison), used his position as an

attorney to oversee a massive mortgage fraud scheme, he received a sentence of forty-eight

months' imprisonment, which also <u>included</u> 24 months for aggravated identity theft.[53]

Finally, in a case involving a single-victim investment scheme in which the defendant

pled guilty to mail and tax fraud, the court imposed a sentence of five years' probation and

ordered restitution of $10 million.[54]

## 5. <u>Restitution[55] and Cooperation</u>

### a. <u>Restitution.</u>

As noted above, restitution is a matter addressed by the defendant from the beginning of

these proceedings, and full restitution was made to both the Estate and the Trust before

sentencing.[56]  This is unusual in having a Guideline loss, but no actual loss.  While the payments

to the IRS will have to await a final determination of tax liability,[57] the victim is a government

agency, with concomitant collection powers.

---

[52]<u>United States v. Hurst</u>, 1:12-cr-162-S.

[53]<u>United States v. Marandola</u>, 1:15-cr-120-M.

[54]<u>United States v. Feibish</u>, 1:12-cr-028-M.

[55]18 U.S.C. §3553(a)(7).

[56]In addition, while it in no way depreciates the severity of the offenses, it should be noted that the in the matter of the Estate, the beneficiaries were several non-profit entities rather than people, and the value of the securities, which were never cashed in, increased in value during the intervening time.  In the case of the Trust, no damage resulted from the temporary absence of the money from the account.

[57]This determination may be somewhat complicated and controversial.  Defense counsel has tried on multiple occasions prior to sentencing to communicate with the civil division of the IRS over the issue of determining the tax liability.  The IRS declined (as is apparently their policy) to engage in any discussions until after sentencing in the criminal case.  Instead, the IRS insisted on the defendant's filing of amended tax returns in conformity with paragraph 1.c. of the Plea Agreement.  This became more difficult than anticipated, particularly with the refusal of the IRS to discuss the matter with defense counsel.  The government has since provided the defense with the information necessary to amend the returns and the defendant is endeavoring to have that accomplished prior to

The PSR has identified several components of restitution in this case.  PSR at ¶¶113-117.

As noted above (in Section II.A.), restitution was made to the Trust prior to the charges being

filed (PSR at ¶15), and to the Estate in March of this year (Document 13-2, p. 7).  The other two

restitution claims referenced in the PSR (at ¶¶116-117) were the subject of a lengthy objection

by the defendant (Document 13-2, at pp. 14-16), and are also not supported by the government.

PSR at ¶115.  These claims should be rejected for the reasons stated in the defendant's objection,

which will not be repeated here.

### b.   Cooperation

Mr. Gallison has cooperated with the government in the investigation of his own

misconduct since the moment law enforcement agents first confronted him.  His retention of

legal counsel was, from the outset, expressly for the purpose of resolving this matter.[58]  "[U]nder

[18 U.S.C.] §3553(a) . . . [the court can] consider cooperation as a sign of positive character

development and or acceptance of responsibility beyond that reflected in the §3E1.1 reduction.

[Citations omitted]."  United States v. Ochoa-Ramos, 2008 WL 2062341, *3 (E.D.Wis. May 13,

2008)(Adelman, J.).  Other courts concur.  "In particular, the Third Circuit has agreed that the

guidelines' provisions on acceptance of responsibility do not preclude a district court from

---

sentencing.  If it cannot occur before June 16, it will certainly be accomplished before the defendant is required to surrender for service of his sentence.

   That, however, does not necessarily end the matter.  There remains the question of how to account for the significant tax deduction that will be generated by the restitution payment.  Defense counsel had hoped to be able to resolve that issue before the returns had to be amended; however, it appears that the resolution will have to occur during the defendant's incarceration.  In any event, it should not adversely affect the court's ability to order restitution within the statutorily allowed time frame, and will certainly not delay the sentencing.

[58]Because of the unavailability of traditional cooperation consideration under U.S.S.G. §5K1.1, "the standard reduction for acceptance of responsibility" does not always fully account for a defendant's post-offense activity.  However, "[u]nder U.S.S.G. § 3E1.1, courts may consider a number of factors in deciding whether to grant the reduction for acceptance of responsibility.  Such factors include: *** voluntary assistance to authorities in the recovery of the fruits and instrumentalities of the offense. . ."  United States v. Milne, 384 F.Supp.2d 1309, 1311 (E.D.Wis. 2005).

factoring a defendant's acceptance and cooperation as part of its §3553(a) analysis.  United States v. Severino, 454 F.3d 206, 211 (3d Cir. 2006) (citing United States v. Gatewood, 438 F.3d 894, 897 (8th Cir. 2006); United States v. Lake, 419 F.3d 111, 114 (2d Cir. 2005); United States v. Milne, 384 F.Supp.2d 1309, 1312 (E.D.Wis. 2005))."  United States v. Cannon, 2009 WL 102532, *4 (N.D.Ind. January 14, 2009)(Simon, J.).  This consideration is not necessarily limited to the conventional construct of cooperation in the investigation and prosecution of another individual.  It can be applied as well to a defendant's assistance in the investigation of his own criminal conduct.  Here, the defendant was extremely cooperative with the government in this regard.

## III.   CONCLUSION

Determining what sentence is "sufficient but not greater than necessary" to achieve the objects of sentencing and to comply with the requirements of §3553(a) is never an easy task.  Like "adequate" in the context of deterrence, and "unwarranted" in the context of disparity, "sufficient" and "necessary" are relative and subjective terms.  In some instances, as the court knows, it is much easier to tell when a sentence is "sufficient but not greater than necessary".  See, United States v. Perry, 389 F.Supp.2d 278, 303 (D.R.I. 2005)(Smith, J.).

It is now up to the court to evaluate not only Mr. Gallison's conduct but, most importantly, Mr. Gallison himself.  While any defendant cannot be judged outside of the circumstances that bring him to judgment in the first place, it is nevertheless true that it is the person that is to be judged; and who Mr. Gallison really is, as well as the impact the sentence will have on him, cannot be ignored.  While sentencing serves multiple purposes and often, as now, requires placing relative and subjective terms into a more absolute and objective form, its goal must always be singular—to be fair.

A.     **Variance from the Guidelines**

According to the PSR, the Guideline range established for this case is 33-41 months of incarceration.  In addition, the Court has no discretion in imposing a consecutive sentence of another 24 months on the conviction for aggravated identity theft.  Thus, the <u>sentencing</u> range is effectively 57-65 months of incarceration,[59] which is significantly greater than what would normally be expected in the circumstances of this type of case.

In asking the court to vary downward from the Guidelines, reference is first made to the statute governing sentences of imprisonment:

> [Title 18 U.S.C.] § 3582. Imposition of a sentence of imprisonment
> **(a) Factors to be considered in imposing a term of imprisonment.**--The court, in determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in section 3553(a) to the extent that they are applicable, <u>recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation</u>. (Emphasis supplied).

While it has been recognized that, as provided in 18 U.S.C. §3582, incarceration does not promote certain critical aspects of sentencing, particularly in cases of non-violent crimes, it likewise cannot be argued that it does not promote others.  In this case, the court's discretion has been somewhat curtailed by the mandatory sentence attached to Count Six.  In that respect, the sentencing considerations which are served by any incarcerative component are satisfied.  Moreover, because (whether or not legally possible), imposing a term of incarceration following a non-incarcerative sentence is, at least, logistically difficult (and somewhat illogical), the

---

[59]Courts have frequently found it necessary and appropriate to grant downward variances because the guidelines "have so run amok that they are patently absurd on their face."  <u>United States v. Adelson</u>, 441 F.Supp.2d 506, 515 (S.D.N.Y. 2006); <u>see also</u>, <u>e.g.</u>, <u>United States v. Parris</u>, 573 F.Supp.2d 744, 745 (E.D.N.Y. 2008)(the guideline range "fails to properly reflect §3553(a) considerations" of sentencing [quoting <u>Rita v. United States</u>, 127 S.Ct. 2456, 2465 (2007)]); <u>United States v. Watt</u>, 707 F.Supp.2d 149, 150 (D.Mass. 2010).

presence of the Count Six sentence virtually requires (whether or not intended by Congress) the imposition of some sentence of incarceration preceding it on some other count of conviction.[60] This circumstance further limits the court's discretion; and so limited, the court will have to determine how much <u>total</u> incarceration is "sufficient, but not greater than necessary" to accomplish the objectives of the statute.

Here, a variance from the guidelines is warranted principally because (a) the restitution to the Estate has been paid in full and was committed to and made, in large part before the case was charged, and in total prior to sentencing; the restitution to the Trust was made before the case was charged; (b) a variance will avoid unwarranted sentencing disparities; and (c), the defendant's personal characteristics, including his medical issues justify consideration.

**B.     Defense Recommendation**

Taking into consideration the actual (<u>i.e.</u>, non-reimbursed) losses, to the Estate and to the Trust, as well as the proper role of the Guidelines as a sentencing factor in the circumstances of this particular case, along with the other requirements of 18 U.S.C. §3553(a), including without limitation giving due consideration to the avoidance of sentencing disparities and the background and characteristics of the defendant, including his cooperation with the government in the investigation of his own misconduct and the resolution of this case, as well as his various medical conditions, the extraordinary efforts made toward restitution, and his positive impact on many lives over the years, Mr. Gallison respectfully suggests that the court impose the following non-Guideline sentence:  with respect to the convictions on each of Counts One through Five and Seven through Nine, that he be sentenced to concurrent terms of incarceration for a period to be determined by the court but not to exceed twelve months; with respect to the conviction on

---

[60]This issue would obviously not arise in the case of a defendant convicted of only aggravated identity theft.

Count Six, that he be sentenced to the mandatory term of incarceration of twenty-four months, consecutive to the sentences imposed on Counts One through Five and Seven through Nine; followed by a term of three years of supervised release, the first twelve months to be served on home confinement; and that during the period of supervised release, he perform a total of two thousand hours of community service as determined by the probation department.

The defendant further requests that no fine be imposed for the reason that most of his resources have already been used to make full restitution to the Estate, and any resources remaining, as well as any other funds he acquires will be needed to pay his tax liability to the Internal Revenue Service.  The defendant, and his counsel, believe that this sentence is in fact "sufficient but not greater than necessary" to achieve the objects of sentencing and to comply with the requirements of §3553(a).

The defendant further requests that, no matter what sentence of incarceration is imposed by the court, he be allowed to self-surrender to whatever institution is designated by the Bureau of Prisons for service of his sentence.

Respectfully submitted,
Raymond E. Gallison, Jr.,
By His Attorney

/s/ *Anthony M. Traini*
Anthony M. Traini (#4793)
56 Pine Street, Suite 200
Providence, RI 02903-2819
Tel:    401.621.4700
Fax:    401.621.5888
Email: amt@atrainilaw.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 13, 2017, a copy of the foregoing Defendant's Sentencing Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.

<u>/s/ *Anthony M. Traini*</u>